IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **LEWIS ELLIS ARNETTE,** | ) | Civil Action No. 7:12cv00519 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **<u>MEMORANDUM OPINION</u>** |
| | ) | |
| **ARMOR CORRECTIONAL** | ) | |
| **HEALTH SERVICES, INC.,** *et al.*, | ) | By: Norman K. Moon |
| Defendants. | ) | United States District Judge |

Lewis Ellis Arnette, a Virginia inmate proceeding *pro se*, filed an amended complaint, pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that defendant Dr. Khairul Emran delayed adequate medical treatment for his digestive disease between October 25, 2010, and March 10, 2011, in violation of the Eighth Amendment of the United States Constitution.[1] I presently have before me several miscellaneous motions and Dr. Emran's motion for summary judgment, which the parties have fully briefed. For the reasons stated herein, I will grant Dr. Emran's motion for summary judgment. Regarding the various remaining motions, I will grant Dr. Emran's motion for a protective order, and I will deny Dr. Emran's motion to strike and Arnette's motion for issuance of a subpoena *duces tecum*, motion to exclude, and motion to compel discovery.

I.

Arnette was incarcerated at Coffeewood Correctional Center ("Coffeewood") where Dr. Emran was the primary physician during the times relevant to this action. Arnette suffers from ulcerative colitis, and Arnette claims that Dr. Emran unlawfully delayed Arnette's consultation with a gastroenterologist between October 25, 2010, and March 10, 2011.

---

[1] By earlier orders, I granted Arnette's motion to voluntarily dismiss claims against Nurse Cathy Wilcox and granted Armor Correctional Health Services' ("Armor Health") motion to dismiss. Consequently, Nurse Wilcox and Armor Health are no longer defendants to this action.

Arnette alleges in the amended complaint that his ulcerative colitis began causing "bloody flares" on July 12, 2010, and he filed a sick call request on July 13. On July 16, Arnette was called to the medical department where Nurse Hickman evaluated Arnette and completed a "Nursing Evaluation Tool," noting that Arnette's chief complaint was his colitis and going to the bathroom ten to fifteen times a day. Nurse Hickman wrote under "Examination Findings," "[R]equest [prescription] for diarrhea," but did not write that Arnette experienced pain or bloody flares. Based on this initial evaluation, Nurse Hickman referred Arnette to Dr. Emran.

Dr. Emran met with Arnette fifteen minutes later, noting in Arnette's medical record that Arnette complained of passing soft stools without blood seven to ten times a day.[2] Dr. Emran examined Arnette's abdomen, noting it was soft, but not tender, and had positive bowel sounds. Dr. Emran also noted that, although Arnette had a history of colitis, Arnette had not experienced a "flare-up" of the condition for the prior eighteen months and that the medicine Flagyl had previously treated the colitis effectively.[3] Dr. Emran again prescribed Flagyl and Imodium for ten days and arranged for Arnette to return for a follow-up visit in two to three weeks. Dr. Emran avers that, based on his review of Arnette's symptoms and medical history during the appointment, he did not believe Arnette was at any serious risk of medical harm or otherwise needed immediate consultant care.[4] First Emran Aff., Docket No. 85-3, ¶ 4.

---

[2] Arnette avers that he told Dr. Emran that he had blood in his stools.

[3] Flagyl is a brand name for metronidazole, "a nitroimidazole antibiotic medication used particularly for anaerobic bacteria and protozoa." http://en.wikipedia.org/wiki/Flagyl (last accessed September 29, 2014); *see also* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689011.html (last accessed September 29, 2014). Previously, Dr. Emran had also prescribed folic-acid tablets, Klor-con, Imodium, and sulfasalazine to help control Arnette's colitis.

[4] Dr. Emran did not note during his examination on July 16, 2010, that Arnette should consult with a gastroenterologist although Arnette avers Dr. Emran told him at this first appointment that a gastroenterology consultation would be scheduled. Nonetheless, this first appointment is not within the timeframe of October 25,

Dr. Emran evaluated Arnette at the follow-up appointment two and a half weeks later on August 3, 2010. Dr. Emran noted that Arnette reported an increase in bowel movements and that the stools contained mucus but not blood.[5] Medical Record ("M.R."), Docket No. 85-1, at 35. Dr. Emran examined Arnette's abdomen, again noting it was soft, but not tender, and had positive bowel sounds. Concluding that Arnette's symptoms were not improving, Dr. Emran renewed prescriptions for Flagyl, Imodium, folic-acid tablets, Klor-con, and sulfasalazine and also prescribed an antibiotic.[6] Dr. Emran also took the additional step of completing a "Consultation Request" form, which initiated the process for Arnette to consult with a gastroenterologist at the Medical College of Virginia ("MCV") in Richmond, Virginia, and he gave the completed form to his administrative assistant for processing.[7] Dr. Emran avers that, based on his review of Arnette's symptoms and medical history during that appointment, he still did not believe that Arnette was at any serious risk of medical harm or otherwise required immediate consultant care. First Emran Aff. ¶ 6. Consequently, Dr. Emran characterized the consultation as "routine" and not as a "priority," "urgent," or an "emergency."[8] M.R. at 24.

Dr. Emran's consultation request was approved on August 10, 2010, and Dr. Emran's administrative assistant called MCV on August 25, September 16, October 20, and November 1,

---

2010, and March 10, 2011, during which Arnette alleges the unlawful delay occurred.

[5] Arnette avers that he told Dr. Emran at this second appointment that he had blood in his stools.

[6] Except for the antibiotic, Dr. Emran kept reauthorizing these prescriptions up to and past March 10, 2011.

[7] Per normal procedures, the administrative assistant forwarded the form to Dr. Emran's supervisor for approval. Once approved, the administrative assistant would arrange an appointment.

[8] An emergency consultation should occur on the same or next day, an urgent consultation should occur within seven days, and a priority consultation should occur within fourteen days. M.R. at 24. No time limit is apparent for a routine consultation. *Id.* Dr. Emran avers that his role in obtaining consultant appointments for Coffeewood inmates was limited to selecting the urgency of the consultation based on his medical diagnosis.

3

2010, but was unsuccessful in scheduling Arnette's consultation with an MCV gastroenterologist. On November 1, MCV told the administrative assistant that, due to MCV's scheduling availability, an appointment would not occur until after January 1, 2011. The administrative assistant informed Dr. Emran on November 11, 2010, about the delay, and Dr. Emran said the wait was permissible because he did not believe Arnette would suffer any harm by waiting until after January 1, 2011, for the consultation.[9]

Nurse Wilcox scheduled the next available appointment for February 9, 2011, at MCV. When security staff attempted to transport Arnette to MCV for the consultation on February 9, Arnette refused to go because he believed he might soil himself during the ninety-minute commute to MCV. Consequently, security staff did not transport Arnette to MCV on February 9. On February 14, a nurse scheduled, and Dr. Emran approved, a new consultation for March 10, 2011, with Gastroenterology Associates, PC, in Warrenton, Virginia, which is an approximately fifty-minute commute from Coffeewood.

Arnette saw Dr. Kim of Gastroenterology Associates, PC, on March 10. Dr. Kim reported that Arnette complained of diarrhea but "denie[d] rectal bleed for about 8 months. He

---

[9] Despite the administrative assistant's unsuccessful attempts to secure an appointment at MCV, staff told Arnette in October 2010 that he had an appointment at MCV, which was "the soonest a[ppointmen]t [they] could [get.]" Grievance Record, Docket No. 85-2, at 1. Consequently, Arnette was upset when he was not sent to a consultation in 2010 because staff had told him that he had an appointment.

Upon learning in October 2010 that the consultation would occur at MCV, Arnette filed a grievance on November 2, 2010, because he felt the approximately ninety-minute commute to and from MCV would cause him to soil himself. Consequently, Arnette asked to meet a gastroenterologist closer to Coffeewood within thirty days. On November 12, 2010, Nurse Wilcox and the administrative assistant arranged a consultation with Gastroenterology Associates, PC, in Warrenton, Virginia, for December 9, 2010. About a week before the appointment, however, prison staff notified medical staff that Arnette could not be transported to the consultation appointment on December 9, 2010, because there was not enough security staff available that day. Consequently, Arnette was not able to consult with a gastroenterologist in 2010 because the next available appointment date was on February 9, 2011.

Although Arnette repeatedly filed grievances to medical staff and prison officials, there is nothing in the record that infers Dr. Emran was aware of the delay between August 3, 2010, and November 11, 2010, or was aware of Arnette's grievances to medical staff and prison officials, or had any control over the scheduling of security staff or routine gastroenterology consultations with private physicians.

4

denie[d] significant abd[ominal] pain that comes and goes. He eats well and has gained weight." *Id.* at 21. Dr. Kim noted that Arnette appeared "well developed, well nourished, and in no acute distress." *Id.* at 22. Ultimately, Dr. Kim requested that Arnette return for a follow-up visit in two months, and he recommended a regimen of prednisone to be tapered for the next six weeks because the ulcerative colitis was "chronically active" and "uncontrolled." Dr. Kim also noted that Arnette may need a colonoscopy in the future for further diagnosis. Notably, Dr. Emran prescribed Dr. Kim's recommended prednisone treatment on that same day, March 10.

On May 12, 2011, Dr. Emran submitted another "Consultation Request" form seeking approval for a "priority" follow-up consultation within fourteen days. An administrator approved Dr. Emran's request on June 20, 2011, and Arnette met with Dr. Banson of Gastroenterology Associates, PC, on June 22, 2011. Dr. Banson recommended a colonoscopy to evaluate Arnette's colon. In light of Dr. Banson's recommendation, Dr. Emran submitted a third "Consultation Request" form that same day to get approval for the colonoscopy.

Dr. Arnold performed the approved colonoscopy on August 9, 2011. The procedure revealed an "endoscopically normal colon" with a suspicion of "very mild proctitis."[10] *Id.* at 23, 38. The pathology report on biopsies taken during the colonoscopy reads, "The findings are consistent with the history of colitis with current minimal activity. There is no evidence of dysplasia or malignancy in any of the biopsies." *Id.* at 39. As of his last known consultation with Dr. Arnold in December 2011, Arnette denied having blood or mucus in bowel movements, and Dr. Arnold concluded that, *inter alia*, a prescription of balsalazide and Imodium, which Arnette was already taking, should be sufficient treatment. *Id.* at 23.

---

[10] Proctitis is an inflammation of the lining of the rectum. *Proctitis, Definition*, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/proctitis/basics/definition/con-20027855 (last visited Sept. 24, 2014).

5

## II.

A party is entitled to summary judgment if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial.[11] *Id.* at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## III.

Arnette alleges that Dr. Emran unlawfully delayed the consultation with a gastroenterologist between October 25, 2010, and March 10, 2011, in violation of the Eighth Amendment of the United States Constitution. I conclude that Dr. Emran was not deliberately

---

[11] A plaintiff cannot use a response to a motion for summary judgment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. *See Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (noting that a plaintiff may not amend a complaint through argument in a brief opposing summary judgment).

indifferent to Arnette's ulcerative colitis between October 25, 2010, and March 10, 2011, and that Arnette did not experience a resultant harm or a worsened condition during the delay. Accordingly, I will grant Dr. Emran's motion for summary judgment.

To succeed on his Eighth Amendment claim for the delay of medical care, Arnette must sufficiently demonstrate that Dr. Emran was deliberately indifferent to a serious medical need.[12] *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Deliberate indifference means a state actor was personally aware of facts indicating a substantial risk of serious harm and actually recognized the existence of such a risk.[13] *Farmer v. Brennan*, 511 U.S. 825, 838 (1994); *Estelle*, 429 U.S. at 104. "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990); *see Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Miltier*, 896 F.2d at 851-52. A health care provider may be deliberately indifferent when the treatment provided is so grossly incompetent, inadequate, or excessive as to shock the conscience or is intolerable to fundamental fairness. *Id.* at 851. A significant delay in the treatment of a serious medical condition may, in the proper circumstances, indicate an Eighth Amendment violation.

---

[12] Arnette's ulcerative colitis qualifies as a "serious medical need." *See, e.g.*, *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (defining a "serious medical need" as, *inter alia*, "one that has been diagnosed by a physician as mandating treatment").

[13] Dr. Emran, although an employee of Armor Health during the relevant time, can be sued under § 1983 as a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 54 (1988) (noting a private physician under contract with a state to provide medical services to prison inmates acts under color of state law when treating a prisoner); *Conner v. Donnelly*, 42 F.3d 220, 223 (4th Cir. 1994) (noting a physician who treats a prisoner acts under color of state law even though there was no contractual relationship between the prison and the physician).

*See Estelle*, 429 U.S. at 104-05 (holding that deliberate indifference may be demonstrated by intentionally denying or delaying access to medical care). However, a significant delay in receiving medical care violates the Eighth Amendment only "if the delay results in some substantial harm to the patient." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) (unpublished) (cited 140 times by courts in the Fourth Circuit); *see, e.g.*, *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

There is no evidence that Dr. Emran's examination and treatment of Arnette either exposed Arnette to a substantial risk of harm or that Dr. Emran recklessly disregarded an apparent substantial risk of harm. Dr. Emran examined Arnette on July 16 and August 3, 2010, reviewed Arnette's medical record, and concluded that Arnette was eligible for a routine consultation with a gastroenterologist. By selecting "routine," Dr. Emran medically concluded that the consultation was not a priority, requiring the consultation within fourteen days; urgent, requiring the consultation within seven days; or an emergency, requiring the consultation within one day. Arnette's disagreement with Dr. Emran's professional determination that the consultation was not a priority, urgent, or an emergency does not state claim for relief via § 1983. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Dr. Emran's treatment of Arnette's ulcerative colitis between October 25, 2010, and March 10, 2011, does not shock the conscience and was not intolerable to fundamental fairness. In fact, the record shows that Dr. Emran actively treated Arnette's condition by prescribing Flagyl, which successfully treated Arnett's prior flare-up, and renewed other prescriptions to treat the new flare-up. There is no evidence inferring that Dr. Emran knew about the delay scheduling the consultation, interfered with staff's efforts to do so in 2010, or affected security

8

staff's ability to transport Arnette on December 9, 2010. When security staff was available to transport Arnette to MCV on February 9, 2011, Arnette refused because he feared he would soil himself during the ninety-minute trip. Consequently, the delay to see a gastroenterologist between February 9 and March 10, 2011, which is the day when Arnette saw Dr. Kim, is wholly attributable to Arnette.[14] Nonetheless, there is no evidence that Dr. Emran interfered with staff rescheduling Arnette to see a gastroenterologist forty minutes closer than MCV.

Arnette repeatedly "disputes" Dr. Emran's recollection of treating Arnette.[15] Despite Arnette's "disputes," the evidence does not reveal a dispute of a material fact about whether Dr. Emran exhibited deliberate indifference between October 25, 2010, and March 10, 2011. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (noting the general rule that the non-moving party may not defeat a properly-supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"). While Arnette is correct that Dr. Emran wrote in the August 2010 "Consultation Request" form that Arnette had an "abdominal cramp" and the "symptom is getting worse," Dr. Emran believed these descriptions qualified Arnette to see a

---

[14] I note that Arnette had no constitutional right to choose which doctor or facility would provide treatment. *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). Furthermore, the medical record indicates that Arnette was offered adult diapers and clean sets of clothing for the trip. Even if these items were not offered, a single instance of merely wearing soiled clothing for a short, ninety-minute trip to and from a medical appointment does not describe cruel and unusual conditions of confinement. *See, e.g.*, *Whitted v. Lazerson*, No. 96 Civ. 2746(AGS), 1998 U.S. Dist. LEXIS 7437, at*5-8, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (holding that an inmate's Eighth Amendment rights were not violated when he was occasionally prevented from using the restroom and had to wear soiled clothes for several hours). While the Constitution protects prisoners from cruel and unusual living conditions, an inmate is not entitled to relief because he has been exposed to uncomfortable, restrictive, or inconvenient conditions of confinement. *See Henderson v. Virginia*, 2007 U.S. Dist. LEXIS 70207, at *26, 2007 WL 2781722, at *7 (W.D. Va. Sept. 21, 2007) (Conrad, J.) (unpublished). Rather, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

[15] For example, Arnette "disputes [Dr.] Emran's misrepresentation that he reported 7 to 10 bowel movements per day []on July 16, 2010[,] but [Arnette] did complain of 10 to 15 bowel movements per day." Pl.'s First Resp., Docket No. 100, ¶ 3.

gastroenterologist for a routine consultation. Notably, Arnette does not allege that he ever told Dr. Emran that he was experiencing "severe abdominal pain" between October 25, 2010, and March 10, 2011. Arnette's disagreement with Dr. Emran's classification of Arnette's medical need as routine, even if it was, *arguendo*, a negligent diagnosis, does not entitle Arnette to relief via § 1983. *Johnson v. Quinones*, 145 F.3d 164, 168-69 (4th Cir. 1998) (citing *Estelle*, 429 U.S. at 106).

Moreover, the evidence does not support finding that Arnette experienced resultant harm or a worsened condition during the delay between October 25, 2010, and March 10, 2011. Dr. Kim noted in his report for the consultation on March 10 that Arnette denied suffering from intermittent significant abdominal pain, constipation, gastrointestinal pain, or rectal bleeding; said he was eating "well and has gained weight"; and appeared "well developed, well nourished, and in no acute distress." Dr. Kim requested a follow-up visit two months later, which is another medical decision that supports classifying Arnette's medical need as routine instead of a priority, urgent, or an emergency. Additionally, the colonoscopy and biopsies revealed all normal findings, and thus, the digestive issues Arnette experienced between July 2010 and August 2011 did not manifest in trauma to internal body parts beyond a "suspicion" of "very mild" proctitis.

I conclude that no dispute of material fact exists and that the record as a whole could not lead a rational trier of fact to find in favor of Arnette. Between October 25, 2010, and March 10, 2011, the record reflects that Dr. Emran did not recognize substantial risk of harm or recklessly disregard an apparent substantial risk of harm, Dr. Emran's treatment does not shock the conscience and was not intolerable to fundamental fairness, and Arnette did not experience a

10

resultant harm or a worsened condition. Accordingly, Dr. Emran is entitled to summary judgment.

## IV.

As for the miscellaneous motions filed by the parties, I will deny Arnette's motion for issuance of a subpoena *duces tecum*, motion to exclude an exhibit, and motion to compel discovery; deny Dr. Emran's motion to strike Arnette's second response in opposition to the motion for summary judgment; and grant Dr. Emran's motion for a protective order.

Arnette requests that a subpoena *duces tecum* be issued to the Virginia Department of Corrections ("VDOC") to obtain the contracts between the VDOC and Armor Health in effect during the relevant times of this litigation. I decline to order the United States Marshals to serve the subpoena because the contract is not relevant or probative of a legal issue in this case and not reasonably calculated to lead to the discovery of admissible evidence.

Arnette asks that his medical record attached in support of Dr. Emran's motion for summary judgment be stricken because Arnette did not give permission for it to be used in this litigation. Virginia Code § 32.1-127.1:03(D)(3) allows health care entities to disclose health records "where disclosure is reasonably necessary to . . . defend a health care entity or the health care entity's employees or staff against any accusation of wrongful conduct." Arnette sued Dr. Emran about conduct while an employee of Armor Health, and thus, Armor Health was permitted to disclose the record. Accordingly, Arnette's motion to strike will be denied.

I will also deny Dr. Emran's motion to strike Arnette's second brief opposing the motion for summary judgment. Local Civil Rule 11(c)(1) limits briefs after a motion for summary judgment to the non-movant's responsive brief and to the movant's reply brief. Dr. Emran's

11

reply brief attached evidence, including VDOC business records and a second affidavit from Dr. Emran, that did not accompany the motion for summary judgment. In light of the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Arnette's *pro se* status, I decline to strike Arnette's second brief and will permit it for equitable reasons to the extent it addresses the new evidence attached to Dr. Emran's reply brief.

I will deny Arnette's motion for discovery and grant Dr. Emran's protective order. Dr. Emran received Arnette's requested twenty-five interrogatories two days before he filed his motion for summary judgment. Six days after filing the motion for summary judgment, Dr. Emran filed the motion for a protective order to preclude discovery until the court ruled on the motion for summary judgment. On November 19, 2013, Dr. Emran objected to and answered the interrogatories, and gave Arnette a complete copy of the more than 400 pages of Arnette's medical records that were within Dr. Emran's possession, custody, or control. In December 2013, Arnette filed a motion to compel discovery. Arnette did not certify in the motion for discovery, as required by Federal Rule of Civil Procedure 37(a)(1), that he "in good faith conferred or attempted to confer with" Dr. Emran in an effort to obtain, without court action, the specific answers he wanted. Furthermore, none of the interrogatories for which Arnette demands new answers are relevant or probative of a legal issue in this case and not reasonably calculated to lead to the discovery of admissible evidence. Consequently, I will deny Arnette's motion for discovery and grant Dr. Emran's motion for a protective order.

## V.

For the reasons stated, I will grant Dr. Emran's motion for summary judgment and motion for a protective order, and I will deny Dr. Emran's motion to strike. I will deny

Arnette's motion for issuance of a subpoena *duces tecum*, motion to exclude, and motion to compel discovery.  An appropriate order accompanies this memorandum opinion.

**ENTER**:  This 29th day of September, 2014.

                                                /s/ Norman K. Moon
                                                NORMAN K. MOON
                                                UNITED STATES DISTRICT JUDGE